IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 14-cv-00041-CMA-BNB

AHMED KHALFAN GHAILANI,

Plaintiff,

v.

ERIC HOLDER, US ATTORNEY GENERAL,
US ATTORNEY'S OFFICE, SDNY,
FEDERAL BUREAU OF INVESTIGATION,
OFFICE OF ENFORCEMENT OPERATIONS,
FEDERAL BUREAU OF PRISONS, and
DAVID BERKEBILE, ADX Warden,

Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter arises on **Defendants' Motion to Dismiss** [Doc. #35, filed 07/11/2014] (the "Motion"). I respectfully RECOMMEND that the Motion be GRANTED.

### I. STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). I cannot act as advocate for a *pro se* litigant, however, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion to dismiss, the court must accept the plaintiff's well-pleaded allegations as true and must construe all reasonable inferences in favor of the plaintiff. City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493 (1986); Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976). The complaint must contain specific allegations sufficient to

establish that it plausibly supports a claim for relief. Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 n.2 (10th Cir. 2007). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).

## II.  BACKGROUND

The plaintiff is incarcerated by the Bureau of Prisons ("BOP") at the United States Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado. He filed his Second Amended Prisoner Complaint on March 6, 2014 [Doc. #13] (the "Second Amended Complaint"). The Second Amended Complaint contains the following allegations:

1. The plaintiff was indicted on December 16, 1998, in the Southern District of New York on charges related to the 1998 bombings of the United States Embassies in Kenya and Tanzania. *Second Amended Complaint*, p. 4, ¶ 1.

2. On July 25, 2004, the plaintiff was captured in Pakistan and turned over to the exclusive custody of the United States. Id. at ¶ 3.

3. On June 9, 2009, the plaintiff was brought to the United States from Guantanamo Bay. He was detained at the Metropolitan Correctional Center and arraigned in the Southern District of New York. Id. at p. 5, ¶¶ 4-6.

4. On or about June 12, 2009, Special Administrative Measures ("SAMs") were imposed in connection with the plaintiff's detention. The SAMs were imposed without notification, opportunity to be heard, or due process of law. Id. at ¶¶ 7-8. The SAMs have been renewed annually since 2009. Id. at p. 6, ¶ 9.

5. The plaintiff was convicted on November 17, 2010, and sentenced to life imprisonment without parole on January 25, 2011.  He was transferred to ADX in June 2011.  The SAMs were continued immediately upon his arrival.  Id. at ¶¶ 11-14.

6.  Prior to the imposition of SAMs at ADX, an FBI Unit Manager wrote to the plaintiff and asked him to provide input concerning the SAMs.  The plaintiff requested that he be allowed to communicate with his grandmother, one cousin, and two nieces.  The plaintiff's request was denied, and he was prohibited from contacting his wife.  "Plaintiff, from fear that he will be subjected to more restrictions [] never made such a request again."  Id. at ¶¶ 18.

7.  "The reasons used by Defendants to justify the initial imposition and subsequent renewals of the SAMs on Plaintiff all are extorted from the indictment on which Plaintiff was tried and sentenced."  Id. at ¶ 19.  The SAMs are imposed "without any legitimate penological end."  Id. at p. 8, ¶ 21.  The plaintiff has been subjected to the SAMs since 2009, and they are annually renewed without procedural due process.  It is possible that the SAMs will be imposed on the plaintiff for "many more years to come."  Id. at ¶ 22.

8.  The SAMs deprive the plaintiff from having any contact with other inmates.  He may orally communicate with other SAMs inmates during predesignated times and places.  No physical contact is allowed.  He is not permitted to communicate by telephone, mail, or in person with any attorney except his attorney of record.  The attorney of record must agree to sign a SAMs affirmation.  All visits with his attorney of record are non-contact visits.  The plaintiff is prohibited from contacting his wife by mail, telephone, or in person.  He is permitted limited communication only with his immediate family members excluding his wife.  He cannot communicate with friends or extended family members, nor can he communicate with any

member of the news media. The plaintiff is not permitted to participate in group prayer. The SAMs continue when he is transferred to or from the custody of the United States Marshal, BOP, or any detention facility. If a conflict arises between the SAMs and the United States Marshal, BOP, or detention facility policies regarding the SAMs, the most restrictive policy is enforced. Id. at pp. 11-13, ¶¶ 39-41.

9.  The SAMs have resulted in "profound depression and vegitative [sic] symptoms on Plaintiff on realizing that no matter how good he behave[s] there is no way to end, shorten, or even to know the duration of his suffering." Id. at p. 13, ¶ 42.

The Second Amended Complaint asserts six claims for relief: (1) violation of the Religious Freedom Restoration Act ("RFRA") and the plaintiff's First Amendment right to free exercise of religion; (2) violation of the plaintiff's First Amendment right "to use of mail"; (3) violation of the plaintiff's First Amendment right to freedom of speech; (4) violation of the plaintiff's Fifth Amendment right to due process; (5) violation of the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment; and (6) violation of the Fifth Amendment prohibition of double jeopardy. The plaintiff requests that the court "review the constitutionality of rule 28 CFR Sec 501.3." He also seeks declaratory and injunctive relief.

### III.  ANALYSIS

#### A.  Claim One

In Claim One, the plaintiff alleges that section 5 of the SAMs violates his First Amendment right to free exercise of religion and RFRA because it (1) prohibits him from engaging in group prayer with other inmates, and (2) provides that if a religious representative approved by the FBI, United States Marshal, BOP, or detention facility is to be present for

prayer with him, the prayer must be conducted as part of a contact or non-contact visit at the discretion of the agency. *Second Amended Complaint*, p. 12, ¶ g; p. 14, ¶¶ a and b. Consequently, the plaintiff, a Muslim, is unable to pray Jumu'ah prayer or five daily prayers in groups as required by his faith. Id. at p. 15, ¶ 50.

The defendants argue that the plaintiff has not stated a plausible claim under RFRA or the First Amendment. *Motion*, pp. 6-13.

The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Although inmates retain First Amendment rights, those rights are not without reasonable limitations. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." Id. In addition:

> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination. To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. We recently restated the proper standard: When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. This approach ensures the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree.

Id. at 349 (internal quotations and citations omitted). See also A l-Owhali v. Holder, 687 F.3d 1236, 1240 (10th Cir. 2012) (stating that "in ruling on a motion to dismiss, a court need only assess, as a general matter, whether a prison regulation is reasonably related to a legitimate penological interest.").

RFRA provides that the government may not substantially burden a person's exercise of religion unless the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a). "[U]nder RFRA, a court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant." Kikumura v. Hurley, 242 F.3d 950, 962 (10th Cir. 2001).

Here, the plaintiff is an al Queda operative who was convicted of conspiring to destroy United States buildings and property and directly or proximately causing the deaths of 224 people and injuring more than four thousand others. United States v. Ghailani 733 F.3d 29, 37-38 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 1523 (2014); United States v. Ghailani, 761 F. Supp.2d 167, 170 (S.D.N.Y. 2011).[1]  When initiating the SAMs in 2009, the Warden of the Metropolitan Correctional Center in New York sent to the plaintiff a memorandum explaining why the SAMs

---

[1] "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record. However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (internal quotations and citations omitted).

were being imposed. *Initial Complaint* [Doc. #1], Ex. 1, p. 1.[2] The Warden stated that the SAMs were adopted based on information of the plaintiff's proclivity for violence. "Specifically, based on evidence linking you with the August 7, 1998 Embassy bombings in Kenya and Tanzania, as well as other information regarding your associations with al-Queda, there is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." Id.

In 2013--after the plaintiff was convicted for his acts of terrorism--Warden Berkebile explained in detail why the SAMs were continued:

> You were convicted for the central role you played in the August 1998 bombings of the United States embassies in Kenya and Tanzania by al-Qaeda that resulted in the deaths of approximately 224 people and injuries to thousands of others. You were indicted in the United States District Court for the Southern District of New York (SDNY) in December 1998 on multiple counts based on your participation in a conspiracy to murder United States nationals. You were captured in Gujrat, Pakistan, in July 2004, along with others, after a shoot-out that lasted several hours. You were initially detained by the Central Intelligence Agency, and then as an enemy combatant in a military prison in Guantanamo, Cuba. In June 2009, you were transferred into BOP custody to stand trial in the SDNY on the above described charges. After a five-week trial in the fall of 2010, you were sentenced to life imprisonment without parole.
>
> Because of your connections to and proclivity for terrorism, the Attorney General signed a memorandum in which the BOP was directed, pursuant to 28 C.F.R. 501.3, to implement Special

---

[2]The plaintiff cites to exhibits that were attached to his initial Complaint [Doc. #1]. I treat those exhibits as if they were attached to the Second Amended Complaint. Written documents attached to a complaint are exhibits and are considered part of the complaint for consideration in a Rule 12(b)(6) dismissal. Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991).

7

Administrative Measures to restrict your access to the mail, the media, the telephone, and visitors.

As detailed in the request from the United States Attorney for the Southern District of New York (USA/SDNY), in furtherance of the planning and execution of the 1998 bombings of the United States embassies in Kenya and Tanzania, you traveled across Tanzania in order to purchase bomb components, including explosive detonators, detonation cord, and hundreds of pounds of TNT. You helped transport these components and move them in safe houses. You also purchased oxygen and acetylene industrial gas tanks and the truck used to execute the attack on the embassy in Tanzania. You also helped transport bomb materials, including explosives to various safe houses in Dar-es-Salaam. Days before the bombings, you, along with your co-conspirators, loaded the bomb components, including gas cylinders and explosives you had purchased, into the bomb truck. Between the 1998 bombings and 2004, you were a fugitive and remained an active participant in al Qaeda by training in the Al Farooq camp in Afghanistan, serving on the front lines outside Kabul, receiving advanced explosive training, serving as a document forger, and as a bodyguard and cook for former al Qaeda leader, Usama Bin Laden.

The U.S. Attorney for the Southern District of New York (USA/SDNY) requested the renewal of the SAM. In reaching the conclusion that there is a substantial risk that your communications or contacts with others could result in death or serious bodily injury to others, the USA/SDNY cites your central role in the United States embassy bombings in Tanzania and Kenya, your extensive training in explosives and coded communications, and your affiliation with and allegiance to al Qaeda. Based on all of these factors, you have the notoriety and ability to inspire and influence others to engage in acts of violence and terrorism.

Based on information provided of your proclivity for violence and your long-standing commitment to jihad, it was found there is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious body injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, we will continue to implement the SAM to restrict your access to the mail, the media, the telephone, and visitors. This SAM will commence immediately upon expiration of the prior

>SAM authorization period and will be in effect for a period of one year, subject to further direction.

Id. at Ex. 2, pp. 1-2.

The plaintiff has submitted the SAMs at issue in this case. The SAMs articulate a compelling governmental interest for imposition of restrictions on the plaintiff's contact with other inmates: the plaintiff's connections to and proclivity for terrorism; his ability to inspire and influence others to engage in acts of violence and terrorism; and a substantial risk that his communications or contacts with others could result in death or serious bodily injury to others. The plaintiff has not alleged any specific facts to show that the government's interest is not compelling or that there is no legitimate, rational basis for the SAMs. Nor has he pled any facts which plausibly show that there are less restrictive alternative means available. He merely argues that because other Muslim inmates are able to participate in group prayer, the practice of group prayer is "compatible with the demand of prison administration." *Second Amended Complaint*, p. 16. That argument ignores the compelling governmental interest that led to the imposition of the SAMs.

Under Ashcroft v. Iqbal, 556 U.S. 662 (2009), the plaintiff must plead sufficient facts to state a plausible claim for relief. He has failed to meet his burden. A l-Owhali, 687 F.3d at1240-41 (affirming the district court's dismissal of inmate's First Amendment claim because inmate failed to allege facts sufficient to show that his SAMs restrictions were not rationally related to a legitimate government interest). Claim One should be dismissed for failure to state a claim upon which relief can be granted.

### B. Claim Two

In Claim Two, the plaintiff alleges that the SAMs violate his First Amendment right "to use of mail." *Second Amended Complaint*, p. 17. He complains that he is unable to use the mail to contact his wife, friends, extended family, the news media, or an attorney to "initiate and litigate a civil action." Id. at pp. 17-18.

"Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." Jacklovich v. Simmons, 392 F.3d 420, 426 (10th Cir. 2004). When renewing the SAMs in 2013, the Warden specifically stated that "[b]ased on information provided of your proclivity for violence and your long-standing commitment to jihad, it was found there is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious body injury to persons." *Initial Complaint* [Doc. #1], Ex. 2, p. 2. The plaintiff does not allege any facts to show that there is no legitimate, rational basis for the restrictions on his mail communications. A l-Owhali, 687 F.3d at 1240-41 (the inmate must plead some plausible facts supporting his claim that the ban on communicating with his family did not serve the purpose of preventing future terrorist activity).

To the extent Claim Two can be construed to allege a violation of the plaintiff's right to access the courts, the plaintiff has failed to allege a plausible claim. The right to access the courts is a fundamental constitutional right. Bounds v. Smith, 430 U.S. 817, 828 (1977). However, an inmate alleging denial of access to the courts must allege an actual injury. Lewis v. Casey, 518 U.S. 343, 349 (1996). To establish actual injury, the inmate must show that "the

10

denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim." Id. at 356. Penrod v. Zavaras, 94 F.3d 1399, 1403 (10th Cir. 1996) (citing Lewis, 518 U.S. at 351). The plaintiff does not allege that imposition of the SAMs hindered his efforts to pursue a nonfrivolous claim. Accordingly, Claim Two must be dismissed for failure to state a claim upon which relief can be granted.

### C. Claim Three

In Claim Three, the plaintiff alleges that section 4 of the SAMs prevents him from communicating with the media in violation of his First Amendment right to freedom of speech. *Second Amended Complaint*, p. 19. This First Amendment challenge again raises the question of whether the SAMs are reasonably related to legitimate penological interests. Gee v. Pacheco, 627 F.3d 1178, 1187 (10th Cir. 2010). The Warden concluded that the media restriction is necessary for the following reasons:

> The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if you advocate terrorist, criminal, and/or violent offenses, or if you make statements designed to incite such acts. Based on your past behavior, it is believed that it would be unwise to wait until after you solicit or attempt to arrange a violent or terrorist act to justify such media restrictions.

*Initial Complaint*, Ex. 2, p. 17.

As with the plaintiff's other First Amendment claims, he must allege "sufficient facts to indicate the plausibility that the actions of which he complains were *not* reasonably related to legitimate penological interests." Gee, 627 F.3d at 1188 (emphasis in original). "This is not to say that [the plaintiff] must identify every potential legitimate interest and plead against it; we do not intend that pro se prisoners must plead, exhaustively, in the negative in order to state a claim.

11

It is sufficient that he plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." Id. Because the plaintiff does not plead any such facts, Claim Three should be dismissed.

### D. Claim Four

In Claim Four, the plaintiff alleges that the SAMs "constitute an atypical and significant hardship on Plaintiff and deprive him a significant liberty interest " in violation of his procedural due process rights. *Second Amended Complaint*, pp. 21-22, ¶¶ 73-77.

The Due Process Clause of the Fourteenth Amendment guarantees due process when a person may be deprived of life, liberty, or property. U.S. Const. amend. XIV, § 1. The Due Process Clause "shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as 'liberty interests.'" Harper v. Young, 64 F.3d 563, 564 (10th Cir. 1995), *aff'd*, 520 U.S. 143 (1997). Thus, before determining whether a plaintiff's procedural due process rights have been violated, the court must determine whether a liberty interest is at stake. If a liberty interest does exist, the court must determine (1) the appropriate procedural protections due to the inmate to prevent arbitrary abrogation of the liberty interest, and (2) whether the inmate was afforded those protections. Wolff v. McDonnell, 418 U.S. 539, 557 (1974). (stating that an inmate found to have a liberty interest is entitled to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated").

"[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Nevertheless, the state or federal government "may under certain circumstances create liberty

interests which are protected by the Due Process Clause." Sandin v. Conner, 515 U.S. 472, 483 (1995).[3] A prisoner's liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, [] nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 483-84.

The following considerations are relevant to the inquiry of what constitutes an atypical and significant hardship: (a) whether the conditions of the plaintiff's confinement relate to and further a legitimate penological interest such as safety or rehabilitation; (b) whether the conditions are extreme; (c) whether placement in the conditions increases the duration of the plaintiff's confinement; and (d) whether placement in the conditions is indeterminate. Estate of Dimarco v. Wyo. Dept. of Corr. Div. of Prisons, 473 F.3d 1334, 1342 (10th Cir. 2007).

As discussed above, the plaintiff does not allege any facts to show that the restrictions do not relate to or further a legitimate penological interest. Although the restrictions are extreme, this factor does not outweigh the first factor given the plaintiff's history as a terrorist. The plaintiff alleges that he was sentenced to life imprisonment without parole, and there is no allegation that the SAMs increase that sentence. Finally, the plaintiff does not allege that the SAMs are indefinite. To the contrary, he alleges that they are reviewed annually. The plaintiff has failed to allege facts demonstrating that the SAMs implicate a liberty interest. Indeed, courts

---

[3]In Sandin, the Court eschewed the methodology it had previously applied to determine the existence of a liberty interest. The prior methodology required examination of prison regulations "to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement." 515 U.S. at 480-81. The Court instead returned to the due process principles that were established and applied in Meachum v. Fano, 427 U.S. 215 (1976), and Wolff v. McDonnell, 418 U.S. 539 (1974). Those principles focus on the nature of the deprivation instead of the language of a particular regulation. Sandin, 515 U.S. at 481.

in this district repeatedly have found that SAMs do not implicate a liberty interest. Ayyad v. Holder, Civil Action No. 05-cv-02342-WYD-MJW, 2014 WL 4747451, at *36 (D. Colo. Sept. 24, 2014); Yousef v. United States, Civil Action No. 12–cv–2585–RPM, 2014 WL 1908711, at *5 (D. Colo. May 13, 2014); Gowadia v. Stearns, Civil Action No. 13-cv-00077-KMT, 2014 WL 959487, at *10 (D. Colo. March 12, 2014); Sattar v. Holder, Civil Action No. 07-cv-00077-PAB-KMT, 2012 WL 882401, at *10 (D. Colo. March 15, 2012).  Claim Four should be dismissed for failure to state a plausible claim for relief.

### E.   Claim Five

The plaintiff alleges that the imposition and enforcement of the SAMs violate his Eighth Amendment right to be free from cruel and unusual punishment because the SAMS place him "indefinitely in solitary confinement" and "inflict punitive sanctions on Plaintiff without justification."  Id. at pp. 22-23.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care and take "reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quotations and citations omitted).

A prisoner claiming an Eighth Amendment violation must establish both objectively and subjectively that particular conditions of confinement constitute cruel and unusual punishment.  Wilson v. Seiter, 501 U.S. 294, 297-298 (1991).  To satisfy the objective component, a plaintiff

14

"must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. To satisfy the subjective component, a plaintiff must demonstrate that the prison official was "deliberately indifferent" to a substantial risk of serious harm. Farmer, 511 U.S. at 834. The subjective component of a deliberate indifference claim is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

The plaintiff's allegations do not state a plausible claim under the Eighth Amendment. See Hill v. Pugh, 75 Fed. Appx. 715, 721, 2003 WL 22100960 (10th Cir. Sept. 11, 2003) (affirming dismissal of Eighth Amendment claim based on isolation and sensory deprivation because the complaint failed to allege an "unquestioned and serious deprivation of basic human needs" or "intolerable or shocking conditions"). See also Sattar v. Gonzales, No. 07-cv-02698-WDM-KLM, 2009 WL 606115 (D. Colo. March 6, 2009); Reid v. Wiley, No. 07-cv-01855-REB-KMT, 2008 WL 4406560, at *10 (D. Colo. Aug. 21, 2008) (recommending dismissal of Eighth Amendment claim); Reid v. Wiley, No. 07-cv-01855-REB-KMT, 2008 WL 4426083 (D. Colo. Aug. 21, 2008) (adopting recommendation regarding dismissal of Eighth Amendment claim).

The plaintiff does not allege that he has been deprived of adequate food, clothing, shelter, medical care, or safety measures. Nor does he allege that he is completely deprived of communications with others. To the contrary, he alleges that he is able to communicate with his attorney of record (after the attorney signs the SAMs affirmation), other SAMs inmates, and members of his immediate family except his wife. *Second Amended Complaint*, p. 11, ¶ 39a,

39c; p. 12, ¶ 39f. Moreover, he does not allege that he is denied access to reading materials, radio, or television. To the contrary, under his current SAMs, he has access to television, radio, and all books that do not facilitate criminal activity and do not present a substantial threat to the security of the nation and the prison. Id. at Ex. 2, p. 15.

The plaintiff alleges that the SAMs have caused him to "suffer profound depression." Id. at pp. 23-24¶ 87. The plaintiff's *reactions to* his conditions of confinement, without more, cannot serve as a measure of whether he has been deprived of the minimal civilized measure of life's necessities.[4] Magluta v. U.S. Federal Bureau of Prisons, No. 08-cv-00404-CMA-MJW, 2009 WL 1504749, at *7 (D. Colo. May 28, 2009).

The plaintiff has failed to state a plausible claim under the Eighth Amendment. Claim Five should be dismissed.

### F. Claim Six

Claim Six alleges that the SAMs subject him to double jeopardy in violation of the Fifth Amendment. *Second Amended Complaint*, p. 24. "In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution. . . . [T]he risk to which the [Double Jeopardy] Clause refers is not present in proceedings that are not essentially criminal." Breed v. Jones, 421 U.S. 519, 528 (1975). The SAMs did not arise out of criminal proceedings; they are measures imposed by the BOP "that are reasonably necessary to protect persons against the risk of death or serious bodily injury." The Motion should be granted insofar as it seeks dismissal of the plaintiff's double jeopardy claim.

---

[4]The plaintiff does not allege that the defendants have been deliberately indifferent to his mental health needs.

16

### G. Constitutionality of 28 C.F.R. § 501.3

In his Request for Relief, the plaintiff requests that the court "review the constitutionality of the rule 28 CFR Sec 501.3." *Second Amended Complaint*, p. 27, ¶ 95a. "A facial challenge to a [regulation] is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." U.S. v. Salerno, 481 U.S. 739, 745 (1987); Reno v. Flores, 507 U.S. 292, 301 (1993). The plaintiff has not addressed this standard. Therefore, his challenge to 28 C.F.R. § 501.3 must fail.

### IV. CONCLUSION

I respectfully RECOMMEND that Defendants' Motion to Dismiss [Doc. #35] be GRANTED[5]

Dated November 3, 2014.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge

---

[5] Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).